**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-01266-RBJ

OSCAR ALEXIS GONZALEZ AGUILAR
a/k/a Kelly Gonzalez Aguilar

    Plaintiff/Petitioner,

v.

JOHNNY CHOATE, in his official capacity as Warden of the Aurora Contract Detention Facility Owned and Operated by GEO Group, Inc.;
JOHN FABBRICATORE, in his official capacity as Denver ICE ERO Acting Field Office Director;
MATTHEW T. ALBENCE, in his official capacity as Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration & Customs Enforcement;
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

    Respondents/Defendants.

---

## RESPONSE TO HABEAS PETITION

---

On May 6, 2020, Petitioner Oscar Alexis (Kelly) Gonzalez Aguilar filed a Petition for a Writ of Habeas Corpus, seeking immediate release from immigration detention. ECF No. 1 (Pet.), 37. Petitioner's challenge to her conditions of confinement is not cognizable as a habeas petition under 28 U.S.C. § 2241. Even if it were, the Aurora Contract Detention Facility ("Aurora CDF") where Petitioner is housed has taken numerous proactive steps to protect detainees, including screening all entrants to the facility for COVID-19, reducing the number of detainees housed together, increasing cleanings with EPA-approved disinfectants effective against COVID-19, implementing social-distancing measures, and issuing personal protective equipment to detainees and staff. In light of those steps, Petitioner has not shown her continued detention amounts to impermissible punishment, lacks any reasonable relationship to a legitimate governmental

objective, or that Respondents are deliberately indifferent to the risks of COVID-19.[1]

## BACKGROUND

The COVID-19 pandemic poses a threat to people across the globe. For older individuals and those with some underlying health conditions, the risks of serious illness or death from COVID-19 may be increased, but the virus poses a risk to all, the young and the healthy included. Petitioner seeks immediate release based on allegations that she is at a heightened risk of becoming seriously ill if she contracts COVID-19, and that the facility is taking insufficient precautions to prevent the spread of COVID-19.

### I.   Petitioner's immigration history.

Petitioner is a citizen of Honduras who arrived at the United States border in 2014. Ex. A (Decl. of Sarah Garcia), ¶ 5. She was taken into custody, but released shortly thereafter. Ex. A ¶¶ 5-6. In 2017, she was arrested for prostitution and re-detained. *Id.* ¶¶ 9-10. She has been in custody since that time.

In 2018, an immigration judge denied Petitioner's applications for relief and protection from removal, and ordered her removed. *Id.* ¶ 23. After her appeal to the Board of Immigration Appeals was denied, *id.* ¶¶ 24-25, she filed a petition for review with the Tenth Circuit, *id.* ¶ 26; Docket No. 18-9570 (10th Cir.). The Tenth Circuit granted Petitioner a stay of removal, and the petition remains pending. Ex. A ¶¶ 27-28. On May 3, 2019, Petitioner filed a writ of habeas corpus with the United States District Court for the District of New Mexico seeking release due to the

---

[1] In *C.G.B. v. Wolf*, 1:20-cv-01072 (D.D.C.), due to the pandemic, a group of transgender detainees requested a temporary restraining order, class certification, and a permanent injunction ordering supervised release of all transgender people in immigration detention. Although that court has not yet ruled, the class, if certified, would include Petitioner and would preclude individual relief. *See McNeil v. Guthrie*, 945 F.2d 1163, 1165-66 (10th Cir. 1991).

length of her detention, which was denied on March 24, 2020. *Gonzalez Aguilar v. Wolf*, --- F.Supp.3d ----, 2020 WL 1429673 (D. NM Mar. 24, 2020), attached as Ex. B.

On April 9 and April 13, 2020, at the request of Petitioner's counsel, the Department of Homeland Security ("DHS") reviewed Petitioner's case to determine whether she was eligible for humanitarian parole, but declined in each instance. Ex. A ¶¶ 31-32. On April 29, 2020, DHS reviewed Petitioner's custody status in light of the *Fraihait v. ICE*, No. 19-01546 (C.D. Cal.) class action, but again declined to release her. Ex. A ¶ 33.

## II.     Petitioner's health status and access to medical care at Aurora CDF.

Aurora CDF maintains an onsite medical infirmary, which includes negative pressure rooms, and detainees have daily access to medical providers. Ex. C (Decl. of Greg Davies), ¶ 13. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

## III.    Aurora CDF has implemented measures to prevent the spread of COVID-19.

As a contract facility, Aurora CDF is required to meet minimum standards set forth by U.S. Immigration and Customs Enforcement ("ICE"). Ex. C ¶¶ 3-4. Since the outbreak of COVID-19, ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees. *Id.* ¶ 5. ICE has created the Pandemic Response Requirements, which sets forth a number of required mitigation measures for detention facilities. *Id.* ¶ 6. Additionally, Aurora CDF has developed policies and practices in line with the Center for Disease Control and

Prevention ("CDC") Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities. Ex. D ¶ 3.

### A. Screening procedures to prevent the virus from entering the facility.

To prevent new detainees from bringing the virus into Aurora CDF, all new detainees are subject to medical screening upon admission. Ex. C ¶ 8. Detainees are evaluated for symptoms of COVID-19, as well as asked to confirm whether they have been in close contact with any suspected or confirmed cases. *Id.* Any new detainee who meets clinical criteria or who has had direct contact with a confirmed case is tested and isolated. *Id.* ¶ 9. To prevent spread of COVID-19 from asymptomatic carriers, new detainees who do not present symptoms and have not had contact with a confirmed case are kept separate from the general population and monitored by a medical professional for a 14-day quarantine period. *Id.* ¶ 10; Ex. D ¶ 16.

Similarly, all employees and visitors are screened before being permitted to enter the facility. Ex. D ¶¶ 5, 15. The screening processes are routinely updated to remain in accordance with CDC guidance. *Id.* ¶ 5. Presently, screening includes a questionnaire to determine whether the person has had likely contact with the virus or is exhibiting symptoms, and having their temperature taken. *Id.* ¶ 15. Anyone who has a fever, other symptoms, or in contact with someone who has been exposed is instructed to stay home and follow CDC guidelines for self-isolation. *Id.* To further limit the possibility of the virus entering the facility from the outside, ICE Enforcement and Removal Operations ("ERO") has reduced the number of employees on site by half, Ex. C ¶ 16, and all visitation has been suspended, except for attorney visits, *id.* ¶ 20; Ex. D ¶ 14. Attorneys who enter the facility are required to wear personal protective equipment ("PPE"). Ex. D ¶ 14. Detainees may contact their attorneys through phones and tablets. Ex. C ¶ 23. Computers, phones, and tablets are disinfected after each use. *Id.* ¶ 22.

4

B.      **Procedures in the event of exposure to the virus.**

To date, two ERO employees and seven GEO employees at the Aurora CDF have tested positive for COVID-19. Ex. C ¶ 14; Ex. D ¶ 6. Neither of the ERO employees had direct contact with detainees; two of the GEO employees were on leave at the time or had not worked at the facility for several weeks. Ex. C ¶ 14; Ex. D ¶ 6. When an employee who has been at the facility tests positive, GEO reviews the 72 hours prior to the test to evaluate when and how long the employee was at the facility, who they had contact with, and which areas they visited. Ex. D ¶ 7. GEO works with Tri County Health to create a response plan. *Id.* ¶ 8. Employees are notified of potential exposure, and the areas of the facility where the sick employee visited are disinfected. *Id.* ¶ 4. Employees are not permitted to return to work without a return to work authorization form from a physician, which is reviewed by GEO's regional office.

If there is known exposure to COVID-19, asymptomatic detainees are placed in a monitored quarantine for 14 days with restricted movements and twice daily temperature checks. Ex. C ¶ 12; Ex. D ¶ 8. Those who develop symptoms are referred to a medical provider for further evaluation and treatment. Ex. C ¶ 12. All detainees who meet the CDC criteria for testing are tested. Ex. D ¶ 10. This includes any detainee who presents with a fever but has tested negative for flu and strep, or who is recommended for testing by a medical professional. *Id.*

C.      **Social distancing protocols and cleaning procedures within the facility.**

Aurora CDF also has mitigation measures within the facility. While detainees continue to have access to common areas, they may access these areas only on a rotating basis, in groups limited to approximately 20 detainees. Ex. C ¶ 22; Ex. D 20. In the dayrooms and outdoor recreational facilities, detainees are required to maintain six feet of separation. Ex. D ¶ 19. Dayrooms are thoroughly cleaned between groups. Ex. C ¶ 22; Ex. D ¶ 19.

GEO uses EPA approved disinfectants that are effective against the coronavirus. Ex. D ¶¶ 20-21. GEO has an ample supply of cleaning products. Ex. D ¶ 20. All hard surfaces are frequently disinfected. *Id.* GEO has gloves and eye protection for use with cleaning. *Id.* ¶ 21. Detainees have access to soap at no cost, as housing units have both soap dispensers and bar soap. *Id.* ¶ 22. There is hand sanitizer in the hallways throughout the facility. *Id.* ¶ 20. GEO has undertaken efforts to educate detainees on the importance of hygiene practices. *Id.* ¶ 22. Both staff and detainees have been provided with surgical face masks, as well. *Id.* ¶¶ 23-24. Detainees receive replacement masks on Mondays, Wednesdays, and Fridays. *Id.* ¶ 24. Staff also receive three surgical masks per week. *Id.* ¶ 23.

To increase social distancing, ICE has made an effort to reduce the number of detained people, so that facilities are operating at 75% capacity or less. Ex. C ¶ 19. Aurora CDF is currently operating at 40% capacity. *Id.* Petitioner is housed in a dormitory style unit that houses seven detainees; it has capacity for 24 detainees. Ex. D ¶ 26. The detainees sleeping arrangements are spread out, and whenever possible, are more than six feet apart. *Id.*

The mitigation measures appear to be working. To date, 16 detainees have been tested for COVID-19; 13 tests were negative, one is pending, and two were positive. Ex. C ¶ 17. Both detainees who tested positive were transferred to Aurora, diagnosed on arrival, immediately isolated, and neither had contact with the general population. Ex. D ¶¶ 10a-b. One detainee was removed to a hospital, *id.* ¶ 10a; the other is in isolation in a medical cell, *id.* ¶ 10b.

## ARGUMENT

**I. Petitioner may not challenge the conditions of her confinement through a habeas petition seeking immediate release.**

Habeas is not the appropriate vehicle to challenge conditions of detention. "A habeas corpus proceeding attacks the fact or duration of a prisoner's confinement and seeks the remedy

of immediate release or a shortened period of confinement. In contrast, a civil rights action attacks the conditions of the prisoner's confinement and requests monetary compensation for such conditions." *McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 812 (10th Cir. 1997). Indeed, "[i]t is well-settled law that prisoners who wish to challenge only the conditions of their confinement, as opposed to its fact or duration, must do so through civil rights lawsuits," including claims of inadequate medical care. *Standifer v. Ledezma*, 653 F.3d 1276, 1280 (10th Cir. 2011).

While Petitioner requests immediate release, she does not challenge the legality or duration of her detention. Instead, Petitioner contends that the conditions of her confinement are inadequate to protect her from exposure to COVID-19. Her allegations include claims that screening processes are inadequate, Pet. at 15; that she does not have access to the health care she needs, Pet. at 29; that there are inadequate social distancing measures in place, and no access to hand sanitizer and PPE, Pet. at 36. Notably, Petitioner relies on civil rights cases to support her conditions-of-confinement claims. *See* Pet. at 32-33.

Because Petitioner challenges her detention conditions, even if she obtained a favorable determination, it would not automatically entitle her to immediate release, but would require only improvement in the conditions of confinement. As a District Court in Washington recently held, even if the Petitioner could show a Fifth Amendment violation based on conditions of confinement, she "provide[s] no authority under which such a violation would justify immediate release, as opposed to injunctive relief that would leave [her] detained while ameliorating any alleged violative conditions within the facility." *See Dawson v. Asher*, C20-0409JLR-MAT, 2020 WL 1304557, at *1 (W.D. Wash. Mar. 19, 2020). Petitioner relies on *Brown v. Plata*, 563 U.S. 493, 511 (2011), to suggest that release is an appropriate remedy. Pet. at 34. Although the Supreme Court in *Plata* concluded that California was required to reduce its prison population—which was

nearly twice its capacity—the order of release was permitted only after other remedial measures failed. *Id.* at 511-12. Importantly, *Plata* arose under 18 U.S.C. § 3626(a)(3), which outlines the strict requirements that must be met before a court may order the release of prisoners. *Plata* says nothing to suggest that a habeas proceeding may be used to address detention conditions, nor does it suggest that release is the appropriate remedy to problematic conditions. If anything, *Plata* stands for the principle that release should be a remedy of last resort.

Petitioner cites to a number of cases where courts have held that, in light of the COVID-19 pandemic, immigration detainees may seek release from detention under § 2241 based on the allegedly unsafe conditions of their confinement. Pet. at 35, ¶ 98. This view is not unanimous. Other courts have held that § 2241 is unavailable to immigration detainees seeking immediate release from detention due to COVID-19. For example, in *Aguayo v. Martinez*, Judge Domenico held that the court lacked jurisdiction over the alien's claim because it challenged the conditions of his confinement, not the fact or duration of it.  No. 1:20-cv-00825-DDD, 2020 WL 2395638, *2 (D. Colo. May 12, 2020).

In addition, the Eastern District of Virginia rejected a challenge by immigration detainees in ICE custody seeking immediate release due to COVID-19, holding that "§ 2241 does not provide Plaintiffs with either a vehicle to present their claims or a remedy here." *Toure v. Hott*, --- F. Supp. 3d ---, 2020 WL 2092639, at *5 (E.D. Va. Apr. 29, 2020).  The court's analysis was thorough and well-reasoned. *See id.* at *5-8.  It held that "[a] challenge to the constitutional sufficiency of their confinement, even when paired with a request for immediate release, is a challenge to the conditions of their confinement." *Id.* at *5. The court rejected the petitioners' characterization of their Fifth Amendment claim as directed to the "*fact* of their confinement," reasoning that "protections afforded by and during detention are conditions of detention, a complaint about a lack of COVID-19 protections, or insufficient COVID-19 protections, is a complaint of the conditions of confinement." *Id.*

Here, Petitioner's allegations relate to a challenge to the conditions of confinement based on a possible exposure to COVID-19, not a challenge to the fact or duration of her confinement. Thus, she has not asserted a cognizable habeas corpus claim.[2]

## II.     Petitioner has not raised a meritorious claim under the Fifth Amendment.

Petitioner has raised two arguments that she has suffered a violation of her due process rights under the Fifth Amendment: that the conditions amount to unlawful punishment and that officials are deliberately indifferent to her risk for contracting COVID-19. Given the extensive measures Aurora CDF put in place to prevent the spread of the coronavirus, and the evidence that such measures have thus far been effective at preventing the spread, Petitioner fails to demonstrate a constitutional violation under either theory.

### A.     Petitioner fails to show detention conditions amount to unlawful punishment.

First, Petitioner contends that the conditions of her confinement violate her due process rights. Pet. at 35, ¶¶ 99-105. To show a due process violation as a civil detainee, Petitioner must show that she faces deprivation of care or conditions of confinement that effectively amount to punishment, *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), or "that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose," *Colbruno v. Kessler*, 928 F.3d 1155, 1162-63 (10th Cir. 2019); *cf. Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013) (requiring a showing that either "an expressed intent to punish on the part of detention facility officials exists," or "that the restriction in question bears

---

[2] Petitioner added "and Complaint for Injunctive and Declaratory Relief" to the title of her habeas petition, and included 28 U.S.C. § 1331 as a basis of jurisdiction, but this does not demonstrate that the case was filed as a civil action. Petitioner seeks release, and habeas corpus is the exclusive remedy for a petitioner requesting release from detention. *See Heck v. Humphrey*, 512 U.S. 477, 481 (1994). The civil cover sheet, docket sheet, and payment of the $5 filing fee applicable to habeas petitions further demonstrates that Petitioner filed this claim as a habeas claim only.

no reasonable relationship to any legitimate governmental objective."). Petitioner has not made either showing.

First, Respondents are not effectively punishing Petitioner by depriving her of adequate protective measures. They have taken several affirmative steps to reduce the risk of detainee exposure to COVID-19 and to ensure prompt detection and treatment. *See supra* Background Part C; *see generally* Exs. A, C, D. To date, following these measures, the facility has had no known COVID-19 infection spread amongst detainees at a time when the infection rate has exploded in the general population. Indeed, the only two positive cases Aurora CDF has seen were caught during intake procedures, and both detainees were isolated prior to any contact with the general population. This demonstrates that the screening procedures are serving their purpose and are effective.

Of course, Respondents cannot guarantee that Petitioner will never contract COVID-19 while in detention. But the inability to guarantee perfect safety in the future is not evidence that the conditions of Petitioner's confinement amount to punishment prohibited by the Fifth Amendment. *See, e.g.*, *Dawson v. Asher,* No. C20-0409JLR-MAT, 2020 WL 1704324, at *12 (W.D. Wa. Apr. 8, 2020) ("No one can entirely guarantee safety in the midst of a global pandemic."); *cf. Rural Cmty. Workers All. v. Smithfield Foods, Inc.*, No. 5:20-cv-06063-DGK, 2020 WL 2145350, at *9 (W.D. Mo. May 5, 2020) ("[U]nfortunately, no one can guarantee health for essential workers—or even the general public—in the middle of this global pandemic.").

Additionally, Petitioner has not demonstrated that her continued detention and its conditions are not rationally related to a legitimate governmental objective. In general, Petitioner complains that Aurora CDF has not implemented enough protections, rather than that the measures imposed are too restrictive. It is worth noting, however, that although the steps undertaken at the Aurora CDF—such as limiting the number of others with whom Petitioner can interact—may amount to more restrictive

conditions of confinement, those restrictions are designed to ensure the safety, security, and health of detainees and staff, all of which are legitimate government objectives.

Further, the government has a legitimate interest in detaining individuals, like Petitioner, who are in the United States illegally. The legality of Petitioner's detention was recently affirmed by the District Court of New Mexico, Ex. B, and Petitioner does not challenge here that, in general, her detention is lawful. The Supreme Court has consistently upheld the constitutionality of immigration detention, citing the Government's legitimate interest in protecting the public and in preventing aliens from absconding. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). Nor is detention pending removal an "excessive" means of achieving those interests. For over a century, the Supreme Court has affirmed detention as a "constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (collecting cases).

Finally, the government has a legitimate interest in protecting the public from the risk that Petitioner could contract COVID-19 and spread the infection among the general population as she relocates upon release. Petitioner states that she intends to travel to Oakland, California, if released. Pet., Ex. A ¶ 25. Regardless of the precautionary measures Petitioner may undertake, neither Petitioner nor Respondents have any control over the other individuals with whom Petitioner will inevitably come into contact during her travels (or the people with whom those others have come into contact). As a result, Petitioner's travel plans may pose a risk to her own health.

This Court has already been asked to consider the conditions of confinement at the Aurora CDF in light of COVID-19, and the Court held that those conditions did not constitute "exceptional" circumstances warranting release. *See United States v. Eubanks*, No. 19-CR-00234-PAB-3, 2020 WL 1905070 (D. Colo. Apr. 17, 2020). The presentence detainee in that case sought temporary release from the Aurora CDF on the grounds that he was in a high-risk category from COVID-19 due to his lung disease and a compromised immune system. He argued that his susceptibility to COVID-19 if he remained in detention at the Aurora CDF constituted "exceptional reasons" why his detention would

11

be inappropriate. *Id.* at *1 (citing 18 U.S.C. § 3145(c)). The Court disagreed and held that he was not entitled to release from the Aurora CDF, noting, "GEO has instituted measures to protect inmates from the spread of COVID-19" and "[t]here are no inmate cases of COVID-19 at GEO as of the date of this order." *Id.*; *see also United States v. Lake*, No. 19-cr-00500-RM, 2020 WL1852435, at *3 (D. Colo. Apr. 13, 2020) (holding that the risks associated with COVID-19 at the Aurora CDF did not show compelling reason entitling criminal defendant with asthma to release under 18 U.S.C. § 3142(i), "particularly in light of the lack of confirmed cases of COVID-19 among the detainee population at the GEO facility"). The fact that, since *Eubanks*, two detainees have been diagnosed with COVID-19 does not alter the analysis. *See* Ex. D ¶ 10. To the contrary, these cases demonstrate that Aurora CDF appears to be effectively detecting infections upon arrival to prevent the spread within the facility.

Although *Eubanks* arose in the context of criminal, rather than civil, detention, the Court's holding in that case is consistent with those of other district courts that have found the fact of civil detention in the time of COVID-19 does not itself constitute a Fifth Amendment violation. For example, the Western District of Washington dismissed a similar claim filed by habeas petitioners seeking release from ICE civil detention on the grounds that they were particularly vulnerable to COVID-19 given their age and medical conditions. *Dawson v. Asher*, No. C20-0409JLR- MAT, 2020 WL 1304557, at **1-3 (W.D.Wa. March 19, 2020). Other courts have done the same. *See, e.g.*, *Ramirez v. Culley*, No. 2:20-cv-00609-JAD-VCF; 2020 WL 1821305, at *1, *4 (D. Nev. Apr. 9, 2020) (denying request for release by petitioner with pre-diabetes, hypertension, and high cholesterol).

To be sure, other judges have ordered immigration detainees to be released based on the threat of COVID-19, *see, e.g.*, Pet. at 35, ¶ 98, including detainees in different circumstances at the Aurora CDF, *see Essien*, No. 20-cv-1034-WJM, 2020 WL 1974761; *Ixchop Perez v. Wolf*, No. 5:19-cv-05191-EJD, 2020 WL 1865303 (N.D. Cal. Apr. 14, 2020). But this divergence of judicial opinion simply

shows that there is no one-size-fits-all answer to the difficult questions presented during this challenging time. Under the facts of this case, Petitioner has not demonstrated that she is entitled to immediate release.

### B. Petitioner fails to show Respondents are "deliberately indifferent."

Alternatively, Petitioner contends that she has experienced a due process violation because government officials are deliberately indifferent to her health and safety. Federal immigration detainees "walk in much the same shoes as an arraigned pre-trial detainee," and the Fifth Amendment due process standard controls. *See Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010). The Tenth Circuit has held that under the due process clause, detainees are "entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment." *Barrie v. Grand Cty., Utah*, 119 F.3d 862, 867 (10th Cir. 1997). "The Eighth Amendment requires jail officials 'to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety.'" *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (citation omitted). To establish an Eighth Amendment claim for constitutionally inadequate conditions of confinement, a plaintiff must establish two prongs: (1) that, as an objective matter, the alleged deprivation was "sufficiently serious so as to deprive inmates of the minimal civilized measure of life's necessities"; and (2) that the defendant was deliberately indifferent to inmate health or safety. *E.g.*, *Shannon v. Graves*, 257 F. 3d 1164, 1168 (10th Cir. 2001) (citations omitted).[3] For the subjective

---

[3] The Tenth Circuit has not definitively resolved whether the Eighth Amendment's subjective standard—requiring a showing that, as a subjective matter, the defendant was deliberately indifferent—applies to deliberate-indifference claims brought by pretrial detainees under the Due Process Clause, or whether the standard is solely objective. *See Burke v. Regalado*, 935 F.3d 960, 991 n.9 (10th Cir. 2019). Under either standard, the critical question is whether a plaintiff can come forward with "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Colbruno,* 928 F.3d at 1162-63 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)).

component, a plaintiff must allege facts demonstrating the defendant knew of and disregarded an excessive risk to inmate health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

A plaintiff cannot establish deliberate indifference where officials know of a substantial risk to inmate health or safety and "respond[] reasonably to the risk"—even if the officials' efforts ultimately do not avert the harm. *Id.* at 844. Respondents are not charged with guaranteeing no injury and no risk to detainees—rather, they are required to take reasonable steps to protect those in custody. *See Cox v. Glanz*, 800 F.3d 1231, 1247-48 (10th Cir. 2015) ("Prison and jail officials, as well as the municipal entities that employ them, cannot 'absolutely guarantee the safety of their prisoners.'"). As the party seeking mandatory affirmative relief, Petitioner must submit evidence sufficient to prove that Respondents' action to protect detainees at Aurora CDF from COVID-19 are "objectively unreasonable." As demonstrated above, the steps taken to prevent the risk of COVID-19 at Aurora CDF are consistent with CDC guidelines and more than adequate to satisfy the Fifth Amendment.

[redacted]

Many of Petitioner's allegations speak in general terms of difficulties that detention facilities may have in preventing the spread of a disease, without addressing specifically Aurora CDF's efforts. *E.g.*, Pet. ¶¶ 36-37, 43-45, 49-50. Significantly, the allegations raised in Petitioner's declarations regarding conditions at Aurora CDF are directly contrary to the evidence provided in the declaration of Acting Assistant Officer in Charge Greg Davies, Ex. B, and Dawn Ceja of GEO, Ex. D. Petitioner alleges that the facility has no mental health treatment. Pet., Ex. A ¶ 16. In fact, the facility has multiple mental health professionals on staff, Ex. G (excerpt of report to Rep. Crow), and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ While Petitioner makes repeated references to overcrowding, Aurora is currently at only 40% capacity. Ex. C ¶ 19. Petitioner's claims that PPE, hand sanitizer, and soap are in short supply are directly contradicted by Ms. Ceja's declaration. Ex. D ¶¶ 20, 23, 24. Some of Petitioner's complaints are out of date due to the rapidly evolving situation, and some may simply be that Petitioner is not in possession of the information, such as the facility capacity or protocols for new detainees. Regardless, it remains that the competent evidence demonstrates that Aurora CDF has taken measures to prevent the spread of the virus within the detention facility. In short, there is no evidence that, Respondents have increased Petitioner's risk of exposure relative to the public at large.

Even if Petitioner could show that that she was deprived of the "minimal civilized measure of life's necessities," *Shannon*, 257 F.3d at 1168, she still cannot establish "deliberate indifference" to her needs in light of the extensive steps Respondents have taken and continue to take to minimize the risks associated with the COVID-19 pandemic. Although there may be no measures that can completely avert the potential harm caused by COVID-19, the multiple affirmative steps taken by Respondents show that they have "responded reasonably" to the risks to detainee health and safety posed by COVID-19. *Farmer*, 511 U.S. at 844. As this Court recently found, a plaintiff fails to show that defendants disregarded a substantial risk of serious harm to inmate safety due to COVID-19 where

"defendants have taken numerous steps to reduce the risk of transmission." *Nellson v. Barnhart*, No. 20-CV-00756-PAB, 2020 WL 1890670, at *13-14 (D. Colo. Apr. 16, 2020).

### III.  If the Court orders Petitioner released, it should do so with conditions.

If the Court were to order Petitioner to be released, it should do so only under conditions ICE deems appropriate given Petitioner's personal history and circumstances. *Cf. Jones v. Wolf*, No. 20-CV-361, 2020 WL 1643857, at *1 (W.D.N.Y. Apr. 2, 2020) (holding that immediate release is not the appropriate remedy and giving ICE time to implement additional safety measures). Such conditions should include Petitioner: (1) live at a specifically identified address; (2) be transported there by an identified third person; (3) not leave the residence except for medical care or immigration hearings; (4) not violate any federal, state, or local laws; and (5) be subject to, at the discretion of ICE, telephonic, electronic, or GPS monitoring and/or a location-verification or automated-identification system. The Court should also allow ICE at least two business days to implement these conditions, and such other conditions as ICE may deem appropriate, before release.

### CONCLUSION

The petition for a writ of habeas corpus should be denied. If the Court orders Petitioner's release, Respondents respectfully request that it do so only after imposing reasonable conditions.

Respectfully submitted,

JOSEPH H. HUNT  
Assistant Attorney General

JOHN W. BLAKELEY  
Assistant Director  
Office of Immigration Litigation

JESI J. CARLSON  
Senior Litigation Counsel

s/ Aimee J. Carmichael  
AIMEE J. CARMICHAEL  
Senior Litigation Counsel  
Office of Immigration Litigation  
PO Box 878, Ben Franklin Station  
Washington, DC 20044  
Telephone: (202) 305-7203  
Email: aimee.j.carmichael@usdoj.gov

Attorneys for Respondents

## CERTIFICATE OF SERVICE

I certify that on May 22, 2020, I filed the foregoing **RESPONSE TO HABEAS PETITION** with the Clerk of the Court for the District of Colorado using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Nicole Henning, Esq.
Lisa Furby (admission pending)
JONES DAY
77 W. Wacker Drive
Chicago, IL 60601
Telephone:  (312) 782-3939
Fax:  (312) 782-858
Email:  nhenning@jonesday.com
Email:  lfurby@jonesday.com

*Attorneys for Petitioner*

/s/ Aimee J. Carmichael
AIMEE J. CARMICHAEL
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division
United States Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
(202) 305-7203

Attorney for Respondents